WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Miles Parish,

              Plaintiff,

v.

Troy Lansdale, et al.,

              Defendants.

No. CV-17-00186-TUC-JGZ

**ORDER**

Plaintiff Miles Parish brings this civil rights action against Tucson Police Department (TPD) Officers Troy Lansdale and Bradley Kush, the City of Tucson, and TPD Chief of Police.[1] Parish alleges that while Officers Lansdale and Kush were investigating a complaint about a loud party, they illegally entered his home and pulled him outside, taking him to the ground, where Officer Lansdale struck him.

Currently pending before the Court are three motions for summary judgment. Parish seeks summary judgment on Officers Lansdale and Kush's affirmative defenses of qualified immunity and state law defenses, and seeks partial summary judgment on his state law claims. (Doc. 63.) Officers Lansdale and Kush seek summary judgment on Plaintiff's civil rights and state law claims. (Doc. 64.) The City of Tucson and Chief of Police request summary judgment asserting that the City did not maintain policies condoning unconstitutional police conduct. (Doc. 66.) The motions were heard on August

---

[1] Parish's Complaint originally named TPD Chief Roberto Villasenor, the TPD Chief on the incident date. Chief Chris Magnus has since replaced Chief Villasenor. (Doc. 66 at 1.) Under Fed. R. Civ. P. 25(d), Chief Magnus is automatically substituted for Defendant Villasenor for official capacity claims.

20, 2019.

For the following reasons, the Court will grant parts of and deny parts of the motions.

## I.  Factual Background[2]

On December 13, 2015, at around 12:40 a.m., Officer Lansdale and other officers responded to a report of a loud party with yelling and screaming in Parish's neighborhood near the University of Arizona.  (Doc. 42, ¶ 14; Doc. 52, p. 4, ¶ 14; Doc. 53, p. 4, ¶ 14; Doc. 65 at ¶ 1; Doc. 66, p. 2 n.2.)  Upon arriving in the area, Officer Lansdale was able to identify Parish's residence as the source.  Lansdale described the music as overwhelming. (Doc. 65, ¶ 2.)

Officer Lansdale rang the doorbell and knocked on Parish's front door.  (*Id.*)  He could hear people inside yelling "Oh shit, the cops are here.  Turn the music off.  Just be quiet."  (Doc. 65-1, Ex. 1, p. 4.)  He used his flashlight to look through a window where he saw "people begin to scatter and run into different rooms of the house . . . ."  (*Id.* at pp. 3–4.) The music was turned off after Officer Lansdale had been knocking for 30 seconds to a minute.  (Doc. 42, ¶ 20; Doc. 52, p. 4, ¶ 20; Doc. 53, p. 5, ¶ 20.)  Some minutes later, the house became dark inside other than the flashing DJ-style lighting.  (Doc. 42, ¶ 17; Doc. 52, p. 4, ¶ 17; Doc. 53, p. 5, ¶ 17.)

Officer Lansdale continued knocking and asking for a resident to open the door.[3]

---

[2] Numerous statements of facts and controverting statements of fact were filed by the parties in support of and in opposition to the motions.  The Court culled through these filings and some of the underlying documents to identify those facts that were disputed and those that were not.

[3] According to Officer Lansdale, one of the officers called out that they were there for a loud party and announced that if someone did not come to the door, "they were gonna get a red tag" as the officers had determined from looking through the blinds that there were more than five people inside.  (Doc. 42-3, p. 5.)  "Red tag" refers to a civil citation for violating Tucson's "unruly gathering" ordinance, which carries a $500 fine.  Tucson City Code § 16-32.  Section 16-32, defines an "[u]nruly gathering" as "a gathering of five (5) or more persons on any private property . . . in a manner which causes a disturbance of the quiet enjoyment of private or public property by any person or persons. Such disturbances include, but are not limited to, excessive noise . . .  the service of alcohol to minors or consumption of alcohol by minors, fighting, disturbing the peace . . . ." Tucson City Code § 16-32(a).  "A peace officer may abate an unruly gathering by reasonable means including, but not limited to, citation or arrest of violators under applicable ordinances or state statutes, and dispersal of the persons attending the gathering."  *Id.*

(Doc. 42 at ¶ 24; Doc. 52, p. 5, ¶ 24; Doc. 53, p. 5, ¶ 24.)  After about four minutes, Parish opened the door just wide enough to lean out his head and part of one shoulder.  (Doc. 42, ¶¶ 24, 28; Doc. 52 , p. 5, ¶¶ 24, 28; Doc. 53, 6, ¶¶ 24, 28; Doc. 65, ¶2.)  At some point, Officer Kush arrived and joined Officer Lansdale on the front porch.  (Doc. 42, ¶¶ 21, 23; Doc. 52, p. 4, ¶¶ 21, 23; Doc. 53, p. 5, ¶¶ 21, 23.)  Officer Lansdale told Parish that the officers were there for a loud party complaint and advised him that if he could get everybody out of the party, he would not be given a red tag.  (Doc. 42, ¶ 31; Doc. 52, p. 5, ¶ 31; Doc. 53 p. 7, ¶ 31.)  According to Officer Lansdale, Parish was initially apprehensive and uncooperative, saying that he would only cooperate if he didn't get a red tag.  (Doc. 65, ¶ 7.)

Parish agreed to disperse the party but insisted on closing his front door.  (Doc. 42 at ¶¶ 32, 33; Doc. 52, p.5, ¶¶ 32, 33; Doc. 53 at 6–7, ¶¶ 32, 33.)  While speaking to Parish, Officer Lansdale placed his foot on the threshold of the doorway to prevent Parish from closing the door.[4]  (Doc. 42, ¶ 30; Doc. 52, p. 5, ¶ 30; Doc. 53, p. 6, ¶ 30; Doc. 65, ¶ 10.)  Parish yelled at Officer Lansdale that he "was entering his f[]ing house without a warrant and that [Lansdale] needed to get the f[] out and the only reason [Lansdale] was coming in was because [Parish] was black."[5]  (Doc. 65, ¶ 10.)  The parties dispute at what point Officer Lansdale placed his foot in the door.  Officer Lansdale states he placed his foot

at § 16-32(b).

[4] The parties dispute where precisely Officer Lansdale placed his foot.  In his response to Plaintiff's statement of facts, Officer Lansdale admits only that he placed his boot "onto the threshold."  (Doc. 53, p. 7, ¶ 34.)  In Officer Lansdale's statement of facts, he claims that he "positioned his foot so that it was on the threshold only and not inside the house."  (Doc. 65, ¶ 11.)  However, Officer Lansdale also admits that Parish was unable to shut the door because of Officer Lansdale's foot, and that Officer Lansdale placed his boot on the threshold in that manner for the express purpose of preventing Parish from closing the door.  (Doc. 42, ¶ 30; Doc. 52, p. 5, ¶30; Doc. 53, 6, ¶ 30; Doc. 65, ¶ 10.)  It is implausible that Officer Lansdale could prevent Parish from closing the door unless his foot extended into Parish's home.  Moreover, at oral argument, defense counsel conceded that when Lansdale placed his boot on Parish's threshold, he made entry into Parish's home.  Importantly, although it is not now disputed whether Officer Lansdale entered Parish's house, the extent of the entry is still at issue.  Parish testified that Officer Lansdale placed his entire foot inside the house, parallel to the threshold and blocking the door.  (Doc. 42, Ex. 5, pp. 111–13.)

[5] The parties dispute whether Parish was intoxicated, but do not dispute that Parish did not want the police to remain at his house.

when Parish became belligerent. (Doc. 53, p. 6, ¶ 30.) According to Parish, Officer Lansdale placed his foot on the threshold's doorstop immediately after Parish opened his front door, so Parish could not close his door.  (Doc. 42, ¶ 30.)

It is undisputed that Parish made numerous requests, characterized by Officer Lansdale as screaming and yelling, that the officers get out, and when Officer Lansdale acknowledged that he did not have a warrant, Parish attempted to shut the door.[6] (Doc. 42, ¶¶ 34, 36; Doc. 52, p. 4, ¶¶ 34, 36; Doc. 53, pp. 7–8, ¶¶ 34, 36; Doc. 65, ¶ 10.)  Officer Lansdale refused to remove his boot from the threshold, advising Parish that "we were going to keep it open" for officer safety reasons.  (Doc. 42, ¶¶ 34, 38; Doc. 52, p. 5, ¶¶ 34, 38; Doc. 53, pp. 7–8, ¶¶ 34, 38; Doc. 65, ¶ 12.)  Officer Lansdale characterized Plaintiff as belligerent and Officer Lansdale was not going to allow the door to be closed because "the totality of the circumstances reflected that people were yelling and screaming, people were scattering within the home, Plaintiff was expressing belligerent behavior and attitude, and it was unknown what was actually occurring in the home."  (Doc. 53, p. 6, ¶ 30.)  Officer Lansdale was concerned about an officer safety issue and a public safety issue.[7] (*Id.*; Doc. 65, ¶ 7.)  Officer Kush said that although Parish was adamant that he was going to close the door, Officer Kush similarly advised Parish that for officer safety reasons the door needed to stay open—to enable the Officers to "see if anyone was walking in or out, as well as to see if there was anybody else in there for a check welfare."  (Doc. 52, p. 5, ¶ 33; Doc. 53, p. 7, ¶ 33.)  Kush explained that he didn't know the intoxication level or ages of anyone in the house.  (Doc. 52, p. 5, ¶ 33; Doc. 53, p. 7, ¶ 33.)

A male occupant of the house tried to pull Parish back into the house and told him he would deal with the police, but Parish continued to scream at Officer Lansdale to get out, and to push the door shut, which he was unable to do because of Officer Lansdale's

---

[6] Officer Kush testified that Parish "'repeatedly requested to close the door, before he would even go and talk—and start having people leave."  (Doc. 42, ¶ 34)

[7] In describing Officer Lansdale's safety concerns, Defendants explain:  "The officers didn't know if people were fighting, or if someone is passed out.  Officer Lansdale has responded to party calls and had shootings, stabbings, homicides, females sexually assaulted and forcibly raped."  (Doc. 65, ¶ 8.)

foot.  (Doc. 65, ¶ 12.)  At some point Officer Lansdale yelled, "Ouch, you're hurting my foot.  You're smashing my foot, you need to stop," but Parish began to scream and yell again that the Officers were entering his house and he pushed the door harder.  (Doc. 65, ¶ 13.)  Officer Lansdale kept his foot on the threshold, and contends it was ultimately trapped in the door.  (Doc. 42, ¶ 43; Doc. 52, p. 6, ¶ 43; Doc. 53, p. 9, ¶ 43.)

As Parish was trying to close the door, Officer Kush heard Officer Lansdale say, "[O]w, you're now hurting my foot[]" and saw "that the door was covering . . . a quarter of the right part of Officer Lansdale's boot, and his foot appeared to be stuck."[8]  (Doc. 42, ¶ 44; Doc. 52, p. 6, ¶ 44; Doc. 53, p. 9, ¶ 44.)  Officer Kush testified that he was concerned for officer safety and "impact pushed[9] the door with two hands," putting a lot momentum into it to release Officer Lansdale's foot.  (Doc. 42, ¶ 45; Doc. 52, p. 6, ¶ 45; Doc. 52, p. 2, ¶ 3; Doc. 53, p. 10, ¶ 45.)  The momentum of pushing the door carried Officer Kush about a step and a half or so inside the door, and put him between the door and the door frame.  (Doc. 52, p. 2, ¶ 5.)  Parish continued to try to shut the door, which, according to Officer Kush, pinned Kush between the door and the door frame.  (Doc. 65, ¶ 15.)  Officer Kush "impact pushed" the door open a second time.  (Doc. 52, p. 2, ¶ 7.)  The second push knocked Parish back into the home and allowed Officer Lansdale and Officer Kush to grab onto Parish's jacket and right arm.  (Doc. 52 p. 2, ¶¶ 7, 8.)

Officers Lansdale and Kush pulled Parish from his house despite efforts from people inside the house to pull Parish back into the house, and Parish and the Officers all ended up on the ground.[10]  (Doc. 65, ¶ 17.)  Parish asserts that the Officers "reached into . . . [his]

---

[8] Officer Lansdale denied the door went over his foot when interviewed by Internal Affairs three days later.  He testified that the door crushed the right side of his toe. (Doc. 42, ¶¶ 46, 48; Doc. 52, p. 6, ¶¶ 46, 48; Doc. 53, p, 10, ¶¶ 46, 48.)

[9] The parties do not describe what an "impact push" is.  The Court notes Parish's testimony that he believed Officer Kush kicked the door open.  (Doc. 42-5, p. 121)  Parish also testified that Officer Kush forced the door open with such force that Parish "flew back." (*Id.*)  Officer Kush confirmed that his second impact push "pushed Parish back into the home." (Doc. 52, p. 2, ¶ 8.)

[10] The Officers contend that "someone in the house was trying to pull Plaintiff back into the house and out of the grip of the officers, in a 'tug of war' fashion.  Further, in the course of resolving the 'tug of war' and Plaintiff's resistance, the officers and Plaintiff stumbled and fell to the ground."  (Doc. 53, pp. 10–11, ¶ 49; *see also* Doc. 52, 6, ¶ 49.)  Officer Lansdale at his

home, pulled . . . [him] from inside, and threw him onto his home's concrete front porch." (Doc. 42, ¶ 49.) According to the Officers, Parish's assaultive conduct against Lansdale and Kush justified their attempt to pull him from the house. (Doc. 52, p. 6, ¶ 49; Doc. 53, pp. 10–11, ¶ 49.) The Officers reasoned that Plaintiff had repeatedly struck Officer Kush with the door, several times, with force, and had resisted his extraction from the house. (*Id.*)

After being pulled from his house, Parish lay on the ground, on his stomach, with his head against the concrete porch. (Doc. 42, ¶ 50; Doc. 52, p. 6, ¶ 50; Doc. 53, p. 6, ¶ 50.) The Officers assert that Parish continued to resist and, as they attempted to handcuff him, Plaintiff lay on his stomach and resisted the Officers' efforts to bring his hands from underneath his chest so he could be handcuffed. (Doc. 65, ¶ 18; Doc. 52, p. 6, ¶ 51; Doc. 53, p. 11, ¶ 51.) Officer Lansdale warned Parish that if he did not comply, the officer would strike him, (Doc. 65, ¶ 18; Doc. 42-3, p. 21), and upon concluding that Parish was not complying, Officer Lansdale struck Parish in the head four times with a closed fist while Parish lay on his stomach on the concrete. (Doc. 42, ¶¶ 53, 54; Doc. 52 p. 6 ¶¶ 53, 54; Doc. 53 p. 11, ¶¶ 53, 54; Doc. 65, ¶ 18.) Parish testified that he did not resist the officers: "I landed on my hand on my chest, and I couldn't get my arm out. And I was wearing a jacket, and my arm was stuck, and I couldn't get it out, and then they were hitting me to, like, pull it out." (Doc. 42-5, p. 124.) After striking Parish, the Officers were then able to handcuff Parish and they pulled him up to his feet. (Doc. 65, ¶ 18.)

Parish claims that he suffered a concussion (and other injuries) as a result of the Officers' actions (Doc. 42, ¶¶ 56, 60), and he testified that when officers brought him to a standing position, he felt dizzy and disoriented. (Doc. 42-5, pp. 129–31.) The Officers state that Parish resisted their efforts to escort him to the patrol car by stomping his feet and attempting to pull back toward his house.[11] (Doc. 65, ¶ 19.) Consequently, the Officers

_____

deposition, described what happened as an "arm-style drag out of the home that wound up in a take down." (Doc. 42-2, p. 52.).

[11] Officer Lansdale characterized Parish's conduct at this point as "defensive resistance." (Doc. 42, ¶ 66.) "At one point in time he was leaning backwards toward the house after he had

put Parish back on the ground and used a TARP restraint to secure his legs together and then carry him to the patrol car. (Doc. 42, ¶¶ 67, 68; Doc. 52, p. 7, ¶¶ 67, 68; Doc. 53, p. ¶¶ 67, 68; Doc. 65, ¶ 19.) Although the use of force involved in putting Parish back onto the ground and employing a TARP restraint is not included in specific statements of fact, the record exhibits include Parish's testimony that as five or six officers were walking him toward the patrol car, the Officers pulled on him, screamed at him to stop resisting, and "they started punching me all over and they took me back to the ground." (Doc. 42-5, pp. 129–132.) Parish was handcuffed behind his back when the take down occurred. (*Id.* at 131.) Officer Lansdale stated that he and another officer used a "leg sweep" maneuver to bring Parish to the ground. (Doc. 42-3, p. 16.) He denied that Parish was struck when brought to the ground. (Doc. 42-2, p. 108.) Parish was taken to the jail.

Officer Lansdale cited Parish for violating Tucson's unruly gathering (red tag) ordinance, a civil infraction. (Doc. 42, ¶ 69; Doc. 52, p. 7, ¶ 69; Doc. 53, p. 13, ¶ 69.) Parish was subsequently found responsible and that finding was upheld on appeal. (Doc. 52 at 7, ¶¶69, 69B.)

Parish was charged criminally with obstruction of government operations and resisting arrest, class 1 misdemeanors. (Doc. 42, ¶ 71; Doc. 52, p. 7, ¶ 71; Doc. 53, p. 13, ¶ 71.) Officer Reese issued the criminal citation. (Doc. 52, pp. 7–8, ¶ 70.) Parish asserts that Officer Lansdale consulted with supervisors in deciding what charges to bring. (Doc. 42, ¶¶ 70–71.) Officer Lansdale could not recall specifically which supervisor made the determination. (*Id.*; Doc. 53, p. 13, ¶¶ 70–71.) The criminal charges were subsequently dismissed. (Doc. 42, ¶ 72; Doc. 52, p. 8, ¶ 72; Doc. 53 p. 13, ¶ 72.)

During the subsequent internal affairs investigation of the incident, Officer Lansdale stated that he was "taught that if you can articulate a safety reason at a party, as long as you're not entering the home, your foot can be in the threshold of the door." (Doc. 42-3, p. 26.) He stated that based on his training, he could put his foot on the threshold even if it prevented the door from closing because "the threshold is not considered part of the

_____

been detained in the handcuffs. Defensive resistance is an attempt to actively get away and/or flee without the use of means of actually harming someone." (*Id.*)

premises . . . . And that's a common consensus between the officers I work with and the officers in this division that I've worked with." (*Id.* at p. 27.)  Officer Lansdale also stated that "I'm a field trainer myself, this is something that is routinely taught to individuals and it goes as far as when officers don't put their foot in the door at loud parties, they've actually been docked for officer safety issues.  So, this is a reoccurring . . . trend in the department that has been established that this is a reasonable and expected thing to be done." (*Id.* at p. 42.)

Sergeant Faulk, one of Officer Lansdale's supervisors, confirmed during the internal affairs investigation that officers "had been trained . . ." to put a foot in the doorway "for a very long time . . ." and that such action "has been . . . a common place, uh, practice due, uh, due to the officer safety concerns and keeping the contact . . . ." (Doc. 67, ¶ 1; Doc. 75, ¶¶ 1, 2.)  Sergeant Faulk defined "threshold" as "the area . . . in between . . . the outside of the house, and the interior of the house.  Meaning the  threshold . . .is normally defined as—or I would say as the, uh, kind of that doorframe area to . . . where you are.  So you're not breaking inside of the . . . scope of the residence." (Doc. 67-2, p. 2.)  According to Sergeant Faulk, "you have the area to where the door is going to close and, uh, so the placement of the foot is not necessarily inside of the house . . . to just make sure that the officers keep a visual on what's going on inside . . . and just keep that contact." (*Id.* at p.3)  He opined that an officer's foot could be caught in the door without having crossed the threshold "because where the door closes, and you look at the actual door jamb, uh, if your foot is there and it can still get stuck between the door because you have an angle of []foot or boot size between doorframe and door closing." (*Id.*)  Sergeant Faulk "would have issues and concerns . . ." if an officer stuck "the lower half of [his] leg inside of the residence . . ." or "put his foot inside of that door." (*Id.* at pp. 3, 4.)

In March 2016, TPD Investigator Lieutenant Doggert prepared an Internal Affairs Report.  Lieutenant Doggert "did not find fault or a violation with Officer Lansdale initially putting his foot in the door when it was opened[.]" (Doc. 75, Ex. 1, p. 3.)  Lieutenant Doggert did find there was "'no legal justification for Officer Lansdale using his boot to

keep the incident location's door open after being asked to remove it. Although this tactic can be used in certain circumstances, there were no reported exceptions to the warrant requirement" in this case. (Doc. 75, ¶ 5.) Lieutenant Doggert concluded:

> Officer Lansdale was acting in good faith when he placed his boot into the door threshold and although I disagree with his action, I believe he was trying to work in a safe and effective manner. He did not knowingly misuse his authority. Additionally, Sgt. Faulk confirmed that this practice was common amongst some officers and that in his opinion the actions were appropriate.

(Doc. 67, ¶ 2 (emphasis omitted).)

Lieutenant Doggert also found that that Officer Lansdale violated several TPD General Orders.[12] (Doc 75, ¶ 4.) He recommended that Officer Lansdale receive a written reprimand. (Doc. 75, Ex. 1, p.7.) In concurring in Lieutenant Doggert's recommendation, one Chain of Command officer further recommended training on "'threshold' related" matters, and another Chain of Command officer recommended training on Fourth Amendment issues. (Doc. 67, ¶ 4; Doc. 75, ¶ 6.)

On December 11, 2016, Parish filed suit. Parish alleges his Fourth Amendment rights were violated when (1) Officers Lansdale and Kush illegally entered his home, seized him, and maliciously prosecuted him (Count VIII); (2) Officer Lansdale used excessive force (Count VIII); and (3) Officer Kush failed to intervene to prevent Officer Lansdale's unlawful entry and use of excessive force (Count VIII). (Doc. 1-3.) Parish asserts state law claims against Officer Lansdale for assault and battery, negligence, aggravated negligence, abuse of process, and false imprisonment (Counts I, III, IV, V, VI); and state law claims against Officer Kush for aiding and abetting an assault and battery, negligence, and false imprisonment. (Counts II, III, VI). Finally, Parish brings a § 1983 claim against the City of Tucson and TPD Chief of Police alleging that they maintained a policy condoning Officer Lansdale's unlawful entry into his residence and used

---

[12] The TPD General Orders Officer Lansdale was found to have violated provide that: officers shall observe and obey all laws and Department general orders; searches may not be performed without a warrant unless the search can be justified by an exception to the warrant requirement; a person has a reasonable expectation of privacy from unreasonable search and/or seizure; consent searches are limited to the consent given and can be revoked at any time; and the warrantless search of a person's home is presumed to be unreasonable and officers must be prepared to justify a warrantless entry into a residence based on an exception to the warrant requirement. (Doc. 67-3, pp. 2–3.)

Internal Affairs to minimize or "cover up" unconstitutional police activity (Count VII).

## II.     Summary Judgment Standard

Currently pending before the Court are three motions for summary judgment or partial summary judgment.  Parish seeks summary judgment as to the applicability of certain affirmative defenses, including qualified immunity, and liability on the state law claims.  (Doc. 63.)  As to the civil rights claims, Officers Lansdale and Kush argue they are immune from suit and their conduct was objectively reasonable.  As to the state law claims, the Officers argue that Parish cannot establish facts to support the necessary elements of those claims.  (Doc. 64.)  The City and the Chief move for summary judgment, arguing that there is no evidence that Officer Lansdale violated Parish's constitutional rights and no evidence that the City or Chief had a policy or practice permitting officers to place a foot inside a residence or refusing to remove their foot when asked to do so, or using Internal Affairs to cover up unconstitutional police activity.

In deciding a motion for summary judgment, the Court views the evidence and all reasonable inferences in the light most favorable to the party opposing the motion.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* A party moving for summary judgment initially must demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. Where the nonmoving party bears the burden of proof, the burden of the moving party may be discharged by showing that there is an absence of evidence supporting its opponent's claim. *Id.*; *see also* Fed. R. Civ. P. 56(c). If a moving party has made this showing, the non-moving party may not rest upon the mere allegations or denials

- 10 -

of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256; *see also Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).

## III. Qualified Immunity

### A. Applicable Law

"In § 1983 actions, the doctrine of qualified immunity protects city officials from personal liability in their individual capacities for their official conduct so long as that conduct is objectively reasonable and does not violate clearly-established federal rights." *Cmty. House, Inc. v. City of Boise, Idaho,* 623 F.3d 945, 964 (9th Cir. 2010) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A state official is entitled to qualified immunity unless the plaintiff can show "(1) the facts '[t]aken in the light most favorable to [plaintiff] . . . show [that] the [defendants'] conduct violated a constitutional right' and (2) the right was clearly established at the time of the alleged violation." *Sandoval v. Las Vegas Metro. Police Dep't,* 756 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *rev'd on other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009)). "Both prongs entail questions of law that [the court] . . . may answer in either order." *Bonivert v. City of Clarkston,* 883 F.3d 865, 872 (9th Cir. 2018).

As to the second prong, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (changes in original). "Importantly, . . . it is not necessary that the alleged acts have been previously held unconstitutional' in order to determine that a right was clearly established, 'as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law." *Bonivert,* 883 F.3d at 872 (internal quotation marks and citation omitted). Therefore, "in some circumstances, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action

in question has [not] previously been held unlawful.'" *Id.* (quoting *United States v. Lanier,* 520 U.S. 259, 271 (1997)). "To evaluate whether a particular question is beyond debate, a court looks for 'cases of controlling authority in [the plaintiff's] jurisdiction at the time' or 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Kramer v. Cullinan,* 878 F.3d 1156, 1163–64 (9th Cir. 2018) (citing *1164 Wilson v. Layne*, 526 U.S. 603, 617 (1999)). At bottom, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier,* 533 U.S. at 202. The plaintiff bears the burden of showing that the right at issue was clearly established. *Kramer,* 878 F.3d at 1164.

When resolving a motion for summary judgment on the issue of qualified immunity, the court must "adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). If "genuine issue[s] of material fact exist that prevent a determination of qualified immunity at summary judgment, the case must proceed to trial." *Sandoval*, 756 F.3d at 1160 (internal quotation and citation omitted); *cf. Pierce v. Multnomah Cty.,* 76 F.3d 1032, 1038–39 (9th Cir. 1996) (holding, in context of a directed verdict, that when foundational facts regarding a qualified immunity defense are disputed they must be decided by the jury before the issue of qualified immunity can be resolved).

### B.    Officer Lansdale's Warrantless Entry Into Parish's House[13]

The Officers assert they are entitled to qualified immunity because Parish fails to present clearly established law "that would have apprised an Arizona police officer that a foot on the threshold under these specific facts and circumstances was unconstitutional." (Doc. 78 at 6.) The Officers initially argued in their motion for summary judgment that Lansdale's placement of his foot on Parish's threshold was not an entry into the house.[14]

---

[13] Both parties' motions address qualified immunity as to all the § 1983 claims, but neither motion specifically addresses the malicious prosecution claim. This order therefore does not make any rulings pertinent to that claim.

[14] The City maintains this position.

They also argued that therefore no constitutional violation occurred. At oral argument, however, counsel conceded that a foot on the threshold is an entry into the structure. And, given the undisputed facts that the door would not close due to Officer Lansdale's placement of his foot, and that Officer Lansdale intended to prevent the door from closing, the Court concludes, as a matter of law, that Officer Lansdale entered Parish's home.

### 1. Clearly Established Right

In December 2015, Parish's right to be free from Officer Lansdale's warrantless entry into his house was clearly established. "At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines,* 569 U.S. 1, 7 (2013) (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961)). "As a matter of clearly established law, 'the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.'" *Bonivert,* 883 F.3d at 874 (quoting *Payton v. New York,* 445 U.S. 573, 590 (1980)); *see also Welsh v. Wisconsin,* 466 U.S. 740 (1984) (discussing necessity of exigent circumstances "[b]efore agents may invade the sanctity of the home . . . ."). The Supreme Court has "made clear that any physical invasion of the structure of the home by even a fraction of an inch [is] too much [for Fourth Amendment standards], and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Kyllo v. United States,* 533 U.S. 27, 40 (2001); Further, the Supreme Court has recognized that the Fourth Amendment's protections "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat [into one's home] would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Jardines,* 569 U.S. at 7. Even when an occupant "chooses to open the door and speak with the officers [who do not have a warrant], the occupant need not allow the officers to enter the premises . . ." without probable cause and exigent circumstances or other exception to the warrant requirement.

*Kentucky v. King,* 563 U.S. 452, 470 (2011).

Courts have consistently relied on the *Payton, Kyllo,* and *Welsh* line of cases in factual scenarios similar to this case to conclude that an officer's warrantless entry into a residence violates the Fourth Amendment absent consent, probable cause and exigent circumstances, or an exception to the warrant requirement. *See e.g., Mitchell v. Shearrer,* 729 F.3d 1070 (8th Cir. 2013) (denying qualified immunity where officer investigating violation of ordinance regarding leaf debris, put her foot in the doorway to prevent resident from shutting it; "a reasonable officer would have known that at the time Mitchell tried to close the door, he stood within his home and thus could not be pulled therefrom and placed under arrest in the absence of exigent circumstances"); *Dalcour v. City of Lakewood,* 492 F.3d. Appx. 924, 928, 932–34 (10th Cir. 2012) (denying qualified immunity where agent "put her foot in the doorway to keep [plaintiff] from shutting the door" because "the facts presented did not establish an objectively reasonable basis for believing anyone in the home needed immediate aid or that there was any other exigent circumstance which would justify a warrantless entry": "Physical entry of a home, even if only with one foot on the threshold, is an entry of the home for constitutional purposes."); *Cummings v. City of Akron,* 418 F.3d 676, 685 (6th Cir. 2005) (warrantless entry unsupported by consent or exigent circumstances was unlawful when the resident attempted to close the door on officers, but one of the officers wedged his foot in the doorway, forced the door open, and went inside); *Siedentop v. State,* 337 P.3d 1, 3 n.5 (Alaska Ct. App. 2014) (officer acted unlawfully when he stuck his foot across the threshold to prevent the person inside from closing the door); *Hanie v. City of Woodstock,* No. 1:06-CV-889-RWS, 2008 WL 476123 at *7 (N.D. Ga. Feb. 19, 2008) (officer investigating noise complaint "was on fair notice that she could not place her foot even a fraction of an inch into the structure of the [plaintiffs'] home."); *State v Maland,* 103 P.3d 430, 434 (Idaho 2004) (finding constitutional violation where, in absence of warrant or probable cause for a felony and exigent circumstances, an officer "insert[ed] her foot into the threshold far enough to prevent [defendant] from closing the door."); *State v. Larson,* 668 N.W.2d 338, 342, 345–46 (Wis. Ct. App. 2003) (absent a

warrant, consent or probable cause and exigent circumstances, officer's intrusion into apartment was illegal; "even if the officer's incursion only extends from the tips of his toes to the balls of his feet, this incursion is the fixed 'first footing' against which the United States Supreme Court . . . [has] previously warned.").

The "emergency aid exception" to the warrant requirement "authorizes a warrantless home entry where officers ha[ve] an objectively reasonable basis for concluding that there [i]s an immediate need to protect others or themselves from serious harm; and [that] the search's scope and manner [a]re reasonable to meet the need." *Rodriguez v. City of San Jose,* 930 F.3d at 1123, 1137 (9th Cir. 2019) (internal quotation marks and citation omitted); *see also Sandoval,* 756 F.3d at 1163–64 (discussing *Ryburn v. Huff,* 565 U.S. 469 (2014) (per curiam), and *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006)). In *Sandoval*, the Ninth Circuit explained that the aid exception permits law enforcement officers to enter a home without a warrant to give emergency assistance to an injured occupant or to protect an occupant from imminent injury. 756 F.3d at 1163. Moreover, an officer may enter without a warrant if he has a reasonable basis for concluding there is an imminent threat of violence or threat to the officers' safety and the safety of others. *Id*. at 1164.

As with all exceptions to the warrant requirement, the emergency aid exception is "narrow and [its] boundaries are rigorously guarded." *Id.* at 1161 (citations and internal quotation marks omitted). Officers bear the burden of demonstrating "specific and articulable facts" to justify the finding of either exigent circumstances or emergency. *Id.* (internal quotation marks and citation omitted). The officers must also show that they could not have obtained a warrant in time. *Id.* Because the officers' actions must be assessed objectively, their subjective motivation is irrelevant. *Brigham City,* 547 U.S. at 404. However, when determining whether an officer is entitled to qualified immunity, the Court considers the facts that were knowable to the defendant officers. *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam).

### 2.     Violation of a constitutional right

In their motion, Defendants argue that a reasonable officer in the field would have believed that the "foot in the door" technique was reasonable and proper "under the circumstances" for the safety of the occupants and the safety of the officers.  (Doc. 64 at 9.)  Defendants state that the danger the officers feared, based on their experience, was that it was a college party, and that there could be underage drinking and other crimes occurring. Further, a neighbor had called because of loud music and screaming and the neighbor had to go to work the next day.  Defendants assert that two grounds permitted the Officers to maintain their warrantless entry:  the need (1) to ensure everyone in the house was safe and leaves the premises, and (2) to protect themselves and the neighborhood.

Viewing the evidence in the light most favorable to the Defendants,[15] under clearly established law, no reasonable officer could have concluded that any exigency, including the emergency aid exception, justified a warrantless entry.  There was no indication of any crime that was occurring within the home. Rather, Officers were responding to a complaint of a loud party in a university neighborhood— a potential civil infraction.  Officer Lansdale contends that based on the yelling and screaming he heard inside the house, the Officers did not "know if people were fighting, we don't know if someone is passed out. . . ." (Doc. 65-1, Ex. 4, p. 68.)  He asserts that "party calls are very dynamic.  We've responded to party calls and had shootings, stabbings, homicides, females sexually assaulted and forcibly raped.  The dynamic is we don't know what's going on."  (*Id.*)

"Simply invoking the unknown . . ." is insufficient to justify warrantless entry. *Sandoval,* 756 F.3d at 1164; *see also Bonivert,* 883 F.3d at 877–78 (rejecting emergency exception where officer's "only mention of an actual threat was in terms so general that they could apply to any interaction involving a criminal suspect in a  home."); *LaLonde v. Cty. of Riverside,* 204 F.3d 947, 957 (9th Cir. 2000) (burden of establishing exigent circumstances based on officer safety "is not satisfied by leading a court to speculate about

---

[15] A decision to deny qualified immunity is reviewed "by assuming that the version of the material facts asserted by the non-moving party is correct."  *Nicholson v. City of Los Angeles,* 935 F.3d 685,693 (9th Cir. 2019) (citation omitted).

what may or might have been the circumstances.")    And here, there is no evidence from which a reasonable juror could conclude that the occupants or the officers were in any danger, or that any crime was occurring.   Officer Lansdale admitted as much when he testified that he did not have probable cause to believe that any crime was occurring inside.[16]  His statement that "reasonable suspicion is there to the extent of the unknown" is insufficient.[17]   (Doc. 42, ¶ 42.)   Similarly, Officer Kush conceded that there was no probable cause to believe any emergency was occurring or that anyone's safety was issue.  When asked whether he believed that criminal activity was occurring inside of the house, he responded no, "but there's a potential for one."  (Id.)   On the undisputed facts, the Officers lacked an "objectively reasonable basis for concluding that there [wa]s an immediate need [for officers] to protect others or themselves from serious harm."  *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008).   Therefore, Court will deny Officer Lansdale's request for summary judgment on qualified immunity concerning Parish's illegal entry claim.[18]

## C.    Officer Kush's entry and Parish's seizure by both Officers

Officer Kush entered Parish's home during his attempt to extract Officer Lansdale's foot from the doorway.  Parish claims his constitutional rights were violated when Officer

---

[16] There is a suggestion that Parish was committing the crime of underage consumption. However, whether he was intoxicated is disputed.  And there is no evidence that the officers were aware of Parish's age at the time he answered the door, or that they were able to fully observe him from behind the door.

[17] The fact that Officers initially stated that they did not intend to cite anyone or to determine if underage drinking was occurring further supports the conclusion that there was no exigency or probable cause.

[18] The Court also rejects Defendants' contention that because they were at Parish's to break up a loud party and not to conduct a search or seizure, Office Lansdale placing his "foot in the door . . ." was "'de minimis' at best and does not rise to the level of a Fourth Amendment violation."  (Doc. 64, p. 8.)  Defendants cite *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994) in support of their argument.  Unlike the building inspector in *Artes-Roy*, who left when asked, Officer Lansdale refused Parish's requests to remove his foot so Parish could shut the door. Officer Lansdale's persistent failure to honor the fundamental and clearly established right to be free from unreasonable intrusion into one's home amounted to more than a de minimis violation of Parish's constitutional rights. Moreover, as a reasonable juror could conclude that Officer Lansdale's conduct resulted in Parish being pulled from his home and subjected to an unwarranted use of force, the Court rejects Defendants' arguments that all of the alleged constitutional violations should be dismissed as "trifling matters."

- 17 -

Kush forced his door open, entered his home, and the Officers pulled him from his home. Officer Kush argues that whether illegal entry into a home occurs "when an officer is trying to prevent an assault on another officer, and the momentum of pushing a door open carries his foot into a doorway . . . " was not clearly established at the time of the incident. (Doc. 50, p. 6)  He also argues no constitutional violation occurred because his conduct was reasonable. (*Id.*)  The Officers contend that when they pulled Parish out of his home, they had probable cause to believe he had committed felony assault on both of them by shutting the door on them. (*Id.*).  The Court concludes that the Officers are not entitled to qualified immunity as to these claims because there are disputed issues of fact.

### 1.    Clearly Established Right

As set forth in Section III.B., the law clearly established that Officer Lansdale's warrantless entry into Parish's home was not justified.  On that date, the right to be free from warrantless seizures in one's home was also clearly established.  "The Fourth Amendment protects against warrantless arrest inside a person's home in the same fashion that it protects against warrantless searches of the home, which is to say that police officers may not execute a warrantless arrest in a home unless they have both probable cause and exigent circumstances."  *Hopkins v. Bonvicino,* 573 F.3d 752, 773 (9th Cir. 2009) (citing *Payton*, 445 U.S. at 586; *Welsh*, 466 U.S. at 749).

### 2.    Violation of Constitutional Rights

Officer Kush asserts that the risk of injury to Officer Lansdale created an exigency that justified his entry into Parish's house.  He claims that after Parish pinned Kush between the door and the door frame, during Parish's attempt to close the door, Kush and Lansdale were justified in seizing Parish and pulling him from his home.  According to Defendants, once Parish "started trying to slam Lansdale's foot in the door, and then Plaintiff was slamming the door into Kush's chest, pinning Kush in the doorway, the die was cast; Plaintiff was going to jail." (Doc. 64 at 12.)

Generally, in the context of warrantless entries, police-created exigencies cannot form "the basis for excusing compliance with the warrant requirement. . . .where

exigencies arose because of unreasonable and deliberate [conduct] by officers, in which the officers consciously established the condition which the government now points to as an exigent circumstance." *United States v. Von Willie,* 59 F.3d 922, 926 (9th Cir. 1995) (internal quotation marks and citations omitted). Here, Officer Lansdale violated Parish's Fourth Amendment rights by placing his foot in Parish's house to prevent Parish from closing the door. Lansdale's refusal to remove his foot and both Lansdale and Kush's insistence that the door remain open resulted in Lansdale's foot being closed in the door. Kush's "impact push" into the house escalated the violation, as did the Officers seizure of Parish. Notably, Parish did not strike the Officers or threaten them. He just tried to close the door. A reasonable juror could reject the Officers' suggestion that Parish's efforts to close the door constituted a felonious assault necessitating the use of force and Parish's arrest. A reasonable juror could conclude that the Officers unreasonably created any exigency. *Mabe v. San Bernardino Cty.,* 237 F.3d 1101, 1107 (2001) ("Whether reasonable cause to believe exigent circumstances existed in a given situation, and the related questions, are all questions of fact to be determined by the jury." (internal quotation marks and citation omitted).) Therefore, the Court will deny the Officers' motion for summary judgment on qualified immunity concerning Kush's entry and Parish's seizure.

### D. Excessive Force

Defendants argue they are entitled to qualified immunity on Parish's excessive force claims because there is no case law "directly on point that says that it is excessive force to face punch an arrestee that refuses to give up his hands from under his body so that he can be handcuffed[]" or "to take the handcuffed arrestee to the ground and to use a TARP [leg] restraint device to immobilize an arrestee's legs when he is resisting with his feet and legs the officers' efforts to escort the arrestee to the patrol car." (Doc. 64, p. 9.)

For the same reasons as stated in Section III. C., the Court concludes material issues of fact preclude summary judgment on the excessive force claims.

### 1. Clearly Established Law

Excessive force claims arising in the context of search or seizure are analyzed under

the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 388 (1989). The Fourth Amendment requires police officers to use "only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn v. City of Orange,* 485 F.3d 463, 477 (9th Cir. 2007) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985)). The Supreme Court has repeatedly emphasized that the general standard for excessive force claims set forth in *Graham*, does not, except in obvious cases, clearly establish that a right exists. *See White*, 137 S. Ct. at 552 (appeals court "misunderstood the 'clearly established' analysis" where it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.") The clearly established law must be particularized to the facts of the case. *Tolan,* 134 S. Ct. at 1866. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Saucier*, 533 U.S. at 205).

Here, the contours of Parish's right to be free from the excessive force at issue was clearly established. In *Sandoval v. Las Vegas Metro. Police Dep't,* 756 F.3d 1154, 1160 (9th Cir. 2014), the Ninth Circuit found that officers were on notice that handcuffing, removing from their residence, and detaining compliant persons not suspected of any crime, or alternatively that causing excessive pain while handcuffing, constituted excessive force. *Id.* at 1165–66. And in *Blankenhorn*, the Ninth Circuit explained that "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes excessive force. . . . But even where some force is justified, the amount actually used may be excessive." 485 F.3d at 477 (citing *Graham,* 490 U.S. at 396 and *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002)).

*Blakenhorn* is particularly relevant. In that 2007 case, the Court found that officers "punching [a suspect] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed, was . . . a Fourth Amendment violation." *Id.* at 481.

The court similarly found that the law clearly established that the application of hobble restraints can constitute excessive force if unnecessary to maintain control of the suspect and prevent possible danger to passersby. *Id.* (denying qualified immunity because a reasonable jury could find that officers' gang-tackling and punching without warning an uncooperative but non-threatening misdemeanor suspect, and later applying a hobble-restraint, was an unreasonable and excessive use of force); *see also Johnson v. Cty. of Riverside,* 2015 WL 13649444, at 9–10 (C.D. Cal. Feb. 17, 2015) (concluding that the law governing the use of hobble restraints was clearly established in light of *Blankenhorn*). The *Blakenhorn* court also recognized that the law permits a "limited right to offer reasonable resistance to an arrest that is the product of an officer's . . . bad faith or provocative conduct." 485 F.3d at 479 (internal quotation marks and citation omitted).

### 2. Violation of a Constitutional Right

Excessive force claims are analyzed under an "'objective reasonableness' standard, which requires balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Sandoval,* 756 F.3d at 1166 (quoting *Graham,* 490 U.S. at 396). In evaluating governmental interests in the use of force, courts must judge reasonableness "from the perspective of a reasonable officer on the scene," and consider several factors when evaluating the strength of the government's interest in the force used, such as: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham,* 490 U.S. at 396. Of the three factors, the most important is whether the suspect posed an immediate threat to officer and public safety. *Young v. Cty. of Los Angeles,* 655 F.3d 1156, 1163 (9th Cir. 2011). Because the balancing analysis "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit] . . . ha[s] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos,* 287 F.3d at

853.[19]

Here, questions of fact preclude granting summary judgment, including whether Parish posed an immediate threat to the safety of the officers and whether he actively resisted. The evidence, viewed most favorably to Plaintiff, shows the Officers were present at the house to investigate a civil infraction. After the Officers arrived, the loud music was turned off and Parish agreed to shut the party down. The Officers claim that Parish assaulted them by closing the door on them. Parish attempted to shut the door only after the Officers refused Parish's repeated requests to leave. Parish did not threaten the Officers. He claims that he did not resist arrest. Against this backdrop, a jury could conclude that (1) Parish posed little, if any, threat to the officers; (2) shutting the door did not constitute threatening behavior; (3) even if Officer Kush was justified in pushing the door open to free Officer Lansdale's foot, the force he used in light of the degree of threat posed by Parish was unreasonable; (4) the amount of force that Kush and Lansdale used to extract Parish from the house was unreasonable; (5) Officer Lansdale's striking of Parish was excessive under the circumstances; (6) the use of TARP was excessive given Parish's conduct and the number of officers present; and (7) the officers acted in bad faith in entering Parish's house and arresting Parish. *See Young,* 655 F.3d at 1164 ("an officer's 'provocative conduct' can trigger an individual's limited right to offer reasonable resistance," thus reducing the reasonableness of force used in response to such resistance.) (internal quotation marks and citation omitted); *Blankenhorn,* 485 F.3d at 479–80 ("The lack of forewarning, the swiftness, and the violence with which the defendant officers threw themselves upon [plaintiff] could reasonably be considered 'provocative,' triggering Blankenhorn's limited right to reasonable resistance and thus making their later use of the hobble restraints unreasonable."). Applying the *Graham* analysis here, the Court finds that there are genuine disputes of material fact which prevent the Court from granting qualified

---

[19] The Supreme Court has "instructed courts not to conflate the analysis for excessive-force claims with related Fourth Amendment claims." *Sharp v. Cty. of Orange,* 871 F.3d 901, 916–17 (9th Cir. 2017) (citing *Cty. of Los Angeles v. Mendez,* 137 S. Ct. 1539, 1547 (2017)). Thus, an unconstitutional entry or arrest like that which may have occurred in this case, "does not predetermine the question of whether the quantum of force used was excessive." *Id.*

immunity on summary judgment on the excessive force claims.[20]

**E.  Officer Kush's failure to intervene to prevent Officer Lansdale's entry and use of excessive force**

Parish claims that Officer Kush violated his Fourth Amendment rights by failing to intervene when Officer Lansdale placed his foot in the doorway, thereby entering his home, and by failing to intervene in Officer Lansdale's use of excessive force. "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon,* 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds,* 518 U.S. 81 (1996).  To be held liable for failing to intercede, the officer must have "had an opportunity to intercede." *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir. 2000).  A passive defendant violates a constitutional right that "is analytically the same as the right violated by the person who . . ." actively engaged in the unconstitutional conduct when he fails to intervene.  *Koon,* 34 F.3d at 1417 n. 25.

Defendants acknowledge that an officer has a duty to intervene, but Officer Kush contends that  because Officer Lansdale is entitled to qualified immunity for the alleged conduct, Officer Kush is likewise entitled to qualified immunity for failing to prevent that conduct.  (Doc. 87 at 1-2.)  In light of the Court's conclusion that Officer Lansdale is not entitled to qualified immunity for this conduct, Officer Kush's argument fails.  Consequently, the Court will deny Officer Kush's request for summary judgment on qualified immunity grounds.

---

[20] The Court notes that, in addition to arguing that they are entitled to qualified immunity, Defendants also assert that "[t]his Court should rule as a matter of law that all actions taken by Officer Lansdale and Kush were objectively reasonable" under *Graham*. (Doc. 64, p. 11.)  The Officer Defendants claim that a reasonable officer would have put his foot on the threshold under the circumstances present here.  *Graham* is a use of force case.  It has no applicability to the reasonableness of Officer Lansdale's warrantless entry into Parish's house.  As for the Officers' remaining conduct, as noted above, in applying the *Graham* factors, questions of fact preclude a determination at this point as to whether the Officers' use of force was objectively reasonable.

## IV. Monell and Supervisor Claims

### A. Defendant City of Tucson

In Count VII, Parish asserts § 1983 claims against the City of Tucson and the Chief of Police, alleging these Defendants maintained a policy condoning constitutional violations related to TPD officers' illegal entry into homes.[21] The City and the Chief move for summary judgment, arguing that there is no evidence that Officer Lansdale violated Parish's constitutional rights and no evidence that the City or Chief had a policy or practice permitting officers to place a foot inside a residence or refusing to remove their foot when asked to do so.

The City of Tucson may not be sued under § 1983 solely because an injury was inflicted by one of its employees. *Long v. Cty. of Los Angeles,* 442 F.3d 1178, 1186 (9th Cir. 2006). Instead, a municipal entity may be held liable only when execution of its policy or custom inflicts the injury. *Id.* (citing *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690–94 (1978)). To succeed on a *Monell* claim, Parish must prove Officer Lansdale deprived Parish of a constitutional right and the City of Tucson had a policy or custom that led to this deprivation. *Monell,* 436 U.S. at 694; *Gillette v. Delmore,* 979 F.2d 1342, 1346 (9th Cir. 1992) (*Monell* liability may be established by "prov[ing] that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.") (internal quotation marks and citation omitted).[22] A widespread practice that, although not authorized by written law or express

---

[21] Defendants also moved for summary judgment on Parish's claims that the City and the Chief maintained a policy to use Internal Affairs to minimize or cover up unconstitutional police activity. Defendants argue that Parish lacks evidence to support these allegations. As Parish failed to respond to this argument and failed to cite any evidence supporting the claim, the Court will grant summary judgment in favor of Defendants on the internal affairs policy claims. *See Celotex,* 477 U.S. at 322 (where the nonmoving party bears the burden of proof, the burden of the moving party may be discharged by showing that there is an absence of evidence supporting its opponent's claim).

[22] Parish is not required to show that the City's alleged practice "was unconstitutional in that it was deliberately indifferent to [] the constitutional rights of its inhabitants," as alleged by Defendants. (Doc. 66 at 4 (citing *Castro v. Cty. of Los Angeles,* 833 F.3d 1060 (9th Cir. 1997)). Parish alleges a "direct" *Monell* claim—that the City affirmatively authorized the alleged

municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law satisfies the second *Monell* prong. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988); *see also Price v. Sery,* 513 F.3d 962, 966 (9th Cir. 2008) (plaintiffs may "establish municipal liability by demonstrating that . . . the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity.") (internal quotation marks and citation omitted). An act performed pursuant to widespread custom need not have "been formally approved by an appropriate decision maker . . . ," *Brown*, 520 U.S. at 404, although proof of random acts or isolated incidents are insufficient to establish a custom. *Navarro v. Block,* 72 F.3d 712, 714 (9th Cir. 1996).

As discussed in Section III.B., on the undisputed evidence, the Court concludes that Officer Lansdale violated Parish's constitutional rights. Officer Lansdale admits that he placed his foot in Parish's doorway in a manner which prevented Parish from closing the door, and Officer Lansdale refused to remove his foot when asked to do so. In viewing the evidence in the light most favorable to Parish, the Court also concludes that there is a material issue of fact as to whether the Tucson Police Department had a policy authorizing officers to enter residences, without exigent circumstances and probable cause or consent, by placing a foot on the threshold of the door to the residence to prevent a resident from closing the door. Facts from which a jury might find that such a policy exists include Officer Lansdale's statement that he acted in accordance with his training when he placed his foot on the threshold; Officer Lansdale's statement that that "the threshold is not considered part of the premises . . . . And that's a common consensus between the officers

---

violations. With direct *Monell* claims, proof that a municipality's decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1994); *Mann v. Cty. of San Diego,* 907 F.3d 1154, 1164 (9th Cir. 2018) (county's "deliberate adoption of its policy or practice establishes that the municipality acted culpably."), *petition for cert. filed* (U.S. May 24, 2019) (No. 18-1465); *see also City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989) (deliberate indifference required where a plaintiff alleges that a facially neutral policy led a municipal employee to violate the plaintiff's rights); *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1185 (9th Cir. 2002) (distinguishing "direct" *Monell* claims from "indirect" claims which allege that a municipality violated the constitution by its omissions and require a showing of deliberate indifference), *overruled on other grounds by Castro,* 833 F.3d at 1076.

- 25 -

I work with and the officers in this division that I've worked with." (Doc. 42-3, p. 27); and Sergeant Faulk's statement that officers "had been trained . . . for a very long time . . ." to put a foot in the doorway  and that this practice was "a common place [] practice."  (Doc. 67, ¶ 1; Doc. 75, ¶ 1.)  Moreover, although Lieutenant Doggert recommended that Officer Lansdale be disciplined for his improper entry, Lieutenant Doggert also concluded that Officer Lansdale was acting in good faith in placing his boot into the door threshold and noted that Sergeant Faulk confirmed that this practice was common amongst some officers and that in Sergeant Faulk's opinion the actions were appropriate.  Presumably, due to this common practice, officers in the Chain of Command recommended training on "'threshold-related" matters and Fourth Amendment issues.  (Doc. 67-3, p. 1.)

In arguing that the internal affairs investigation did not reveal that threshold breaches into a person's home were a common or accepted practice, Defendants suggest that the evidence shows that TPD policy permitted officers only to place a boot on a threshold, not to enter into the residence.  But in placing a boot on a threshold, an officer may enter a residence, as Officer Lansdale undisputedly did at the Parish residence.  Officer Lansdale's and Sergeant Faulk's statements and Lieutenant Doggert's findings suggest that officers had been trained to put their foot on the threshold in the manner that Officer Lansdale did.  *See Hamilton v. City of Olympia,* 687 F.Supp.2d 1231, 1245 (W.D. Wash. 2009) (plaintiff's reliance on testimony from lead officer and training officer was sufficient to establish an issue of fact as to whether use of pepper spray was an "official custom, pattern or policy" under *Monell*.)

Sergeant Faulk defined "threshold" as "the area . . . in between . . . the outside of the house, and the interior of the house." (Doc. 67-2, p. 2.)  But thresholds are not uniform.  And whether a boot would fit on a threshold, without breaking the plane and entering into a residence, depends, of course, on the size of the threshold, the size of the boot, and the placement of the threshold in relation to the interior of the house, i.e., whether the threshold extends into the house.  Sergeant Faulk acknowledged that when an officer puts a boot on a threshold, the officer's foot could be caught in the door.  He opined this was "because

where the door closes, and you look at the actual door jamb, uh, if your foot is there and it can still get stuck between the door because you have an angle of []foot or boot size between doorframe and door closing. (*Id.* at p. 3.) But another reasonable explanation for a boot getting caught in a closing door is that the officer's foot, even if on a threshold, is inside of the house. Because a reasonable juror viewing the evidence in a light favorable to Parish could conclude that Officer Lansdale's conduct was in conformity with a longstanding TPD practice and policy, the Court will deny the City's motion for summary judgment as to Parish's § 1983 claim that the City of Tucson maintained a policy condoning unconstitutional entries into residences.

## B. Defendant Chief of Police

"[I]f individuals are being sued in their official capacity as municipal officials and the municipal entity itself is also being sued, then the claims against the individuals are duplicative and should be dismissed." *Vance v. Cty. of Santa Clara*, 928 F.Supp. 993, 996 (N.D. Cal. 1996) (citation omitted); c*f. Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity . . . for the real party in interest is the entity."). Parish's official capacity claims against the Chief of Police are duplicative of Parish's claims against the City of Tucson. The Court will therefore dismiss the official capacity claims against Chief Magnus.

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir. 1989)). Supervisory wrongful conduct may include action or inaction in the training, supervision, or control of subordinates; acquiescence in the constitutional deprivation; or for conduct that shows a reckless or callous indifference to the rights of others. *Id.* at 1208. As Defendants correctly state, Parish fails to produce any evidence that would support a claim of individual capacity liability against either Chief of Police. Thus, Parish's individual capacity claims against the Chief of Police will also be

dismissed.

**V.    State law claims**

Parish sues Officer Lansdale for assault and battery, abuse of process, and false arrest/imprisonment, and Officer Kush for aiding and abetting an assault and battery, and false arrest/imprisonment. Plaintiff and Defendants seek summary judgment as to liability on the state law claims.

**A.    Dismissal of negligence claims and request for punitive damages on the state law claims**

Parish has withdrawn his negligence and aggravated negligence claims and concedes that he is not entitled to punitive damages on any state law claims.  (Doc. 71, p. 13.)  Accordingly, the Court will dismiss these claims and the request for punitive damages on these claims.

**B.    Tort Claims**

**1.    Assault and Battery**

Parish argues he is entitled to summary judgment because Officer Lansdale admitted all elements of assault. To prove battery Parish must show that Officer Lansdale "intentionally engaged 'in an act that results in harmful or offensive contact with the person of another.'" *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1210 (9th Cir. 2016) (quoting *Duncan v. Scottsdale Med. Imaging, Ltd.*, 70 P.3d 435, 438 (Ariz. 2003)). To succeed on his assault claim, Parish must prove that Officer Lansdale "acted 'with intent to cause [Parish] . . . harmful or offensive contact or apprehension thereof, and [Parish] . . . person apprehend[ed] imminent contact.'"  *Id.* (quoting *Garcia v. United States*, 826 F.2d 806, 809 n.9 (9th Cir. 1987)). "The two claims are the same except that assault does not require the offensive touching or contact. Both require the defendant have the requisite intent." *Id.*  (citations omitted).

For Parish to succeed on his claim against Officer Kush for aiding and abetting an assault and/or battery, Parish must prove the following three elements:   (1) Officer Lansdale committed a tort that caused injury to Parish; (2) Officer Kush knew that Officer

Lansdale's conduct constituted a tort; and (3) Officer Kush substantially assisted or encouraged Officer Lansdale in accomplishing the tort. *Dawson v. Withycombe,* 163 P.3d 1034, 1052 (Ariz. App. 2007). "Because aiding and abetting is a theory of secondary liability, the party charged with the tort must have knowledge of the primary violation, and such knowledge may be inferred from the circumstances." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund,* 38 P.3d 12, 23 (2002). (citation omitted).

Although the undisputed facts establish that Officer Lansdale struck Parish multiple times with a closed fist, and that Officer Kush was present and involved in Parish's arrest, questions of fact exist regarding the applicability of state affirmative defenses. Under A.R.S. § 13-409, an officer cannot be held civilly liable for use of force when effecting an arrest. *Ryan v. Napier*, 245 Ariz. 54, 63 (2018) (quoting A.R.S. § 13-413). That statute provides:

> A person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention or in preventing or assisting in preventing the escape after arrest or detention of that other person, such person uses or threatens to use physical force and all of the following exist:
> 1. A reasonable person would believe such force is immediately necessary to effect the arrest or detention or prevent the escape.
> 2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.
> 3. A reasonable person would believe the arrest or detention to be lawful.

A.R.S. § 13-409.

Viewing the evidence in the light most favorable to the Officers, questions of fact exist as to whether Lansdale's use of force was reasonable under the circumstances and whether the Officers had probable cause to arrest Parish. Consequently, the Court will deny Parish's motion as to the assault and battery charges.

The Officers advance two arguments in support of their motion for summary judgment on the assault and battery claims. First, their use of force was supported by probable cause to arrest after Parish assaulted them. Second, pursuant to *United States v.*

*Span*, 970 F.2d 573 (9th Cir. 1991), Parish did not have a right to resist the arrest, even if it was not supported by probable cause. (*Id.*)

Viewing the evidence in the light most favorable to Parish, the Court will deny the Officers' motion for summary judgment on the assault and battery claims. As noted above, questions of fact exist regarding the existence of probable cause and application of A.R.S. § 13-409's justification defense. Moreover, although *Span* recognizes that "an individual has a limited right to offer reasonable resistance to an arrest that is . . . triggered by the officer's bad faith or provocative conduct," *Id.*, 970 F.2d at 580 (citation omitted), a reasonable jury might conclude that any resistance on Parish's part was reasonable in light of Officer Lansdale's conduct.

## 2. False arrest/Imprisonment

Under Arizona law, "false arrest and false imprisonment differ only in terminology and are defined as the detention of a person without his consent and without lawful authority." *Spears v. Ariz. Bd. of Regents,* 372 F.Supp. 3d 893, 922 (D. Ariz. 2019) (internal quotation marks and citation omitted). "The essential element necessary to constitute either false arrest or false imprisonment is unlawful detention." *Id.* (internal quotation marks and citation omitted). To make a warrantless arrest, the Officers needed probable cause to believe Parish had committed a criminal offense.

Officers Lansdale and Kush seek summary judgment arguing they had probable cause to arrest Parish because he committed felony assault when he shut the door on them. Parish argues that probable cause was lacking because Officer Lansdale was trespassing when he refused to remove his foot from the doorway. Parish argues that Arizona law permits use of reasonable force to prevent the Officers' criminal trespass[23] into his home. A.R.S. § 13-407(A). Whether Parish's reliance on A.R.S. § 13-407 is viable depends on the jury's determination of factual questions regarding the circumstances of Officer

---

[23] Criminal trespass in the third degree occurs when a person "[k]nowingly enter[s] or remain[s] unlawfully on any real property after a reasonable request to leave by . . .the owner or any other person having lawful control over such property, or reasonable notice prohibiting entry." A.R.S. § 13-1502(A)(1).

Lansdale's entry.  Moreover, there are factual disputes as to the existence of probable cause and the question of whether Parish ordered the Officers off of his property, or only out of his house.  Accordingly, the Court will deny both parties' motions for summary judgment on the false arrest/imprisonment claim.

### 3. Abuse of Process against Officer Lansdale.

To prove abuse of process, Parish must establish "a wilful act in the use of judicial process for an ulterior purpose not proper in the regular conduct of proceedings."[24] *Morn v. City of Phoenix,* 152 Ariz. 164, 166, 730, P.2d 863, 875 (1986).  "[T]here is no action for abuse of process when the defendant uses the process for its authorized or intended purpose, even though with bad intentions, or . . . . an incidental motive of spite."  *Id.* (internal quotation marks and citation omitted).  Moreover, "an ulterior purpose alone cannot constitute abuse of process."  *Bird v. Rothman,* 627 P.2d 1097, 1100 (Ariz. Ct. App. 1981).

Parish seeks summary judgment on his abuse of process claim against Officer Lansdale.  Parish asserts that Officer Lansdale testified that he did not intend to take action against Parish for the red tag violation, nor did he intend to arrest Parish "until after Parish asked to see a warrant, and asked the officers to leave the property."  (Doc. 63, p. 13.) Parish contends that Officer Lansdale cited Parish in order to punish Parish for invoking his Fourth Amendment rights and to conceal Lansdale's own wrongdoing.  (*Id.*)

Viewing the evidence in the light most favorable to Defendants, the Court concludes that factual questions prevent summary judgment in Parish's favor.  The undisputed facts are that Officer Lansdale gave Parish the option of ending the party or getting a red tag citation.  Instead of stopping the party, Parish became upset that the Officers would not let him shut his door and events escalated, leading to issuance of the citations.  As discussed throughout this Order, questions of fact exist as to whether the Officers had probable cause

---

[24] "'[P]rocess' includes a summons, subpoena, garnishment, writ of replevin, arrest warrant, or 'other  orders directly affecting obligations of persons or rights in property'" *Fappani v. Bratton*, 407 P.3d 78, 81–82 (Ariz. Ct. App. 2017) (quoting 3 Dan B. Dobbs, et. al., *The Law of Torts* § 594 (2d ed 2011)).

to arrest Parish. Resolution of that question can affect the outcome of the abuse of process claim. *See Rondelli v. Pima Cty.,* 586 P.2d 1295, 1301 (Ariz. Ct. App. 1978) (no abuse of process where, *inter alia*, plaintiff failed to produce evidence that defendants "acted willfully to procure [the plaintiff's] . . . arrest for a corporate debt they knew he was not liable for.") As to the red tag notice, a reasonable jury may find that Officer Lansdale lawfully issued the citation, even if he did so out of spite. The Court will deny Parish's motion on this issue.

In their motion for summary judgment on Parish's abuse of process claim, Officers Lansdale and Kush argue that instead of shutting down the party as they requested, Parish "became belligerent, assaulted Lansdale and Kush, resisted arrest, was arrested, charged, and incarcerated. There is no version of the facts that would support an abuse of process claim." (Doc. 64, p. 17.) Viewing the evidence in the light most favorable to Parish, the Court finds there are material issues of fact concerning whether Officer Lansdale cited Parish to conceal a Fourth Amendment violation, or for some other improper purpose.

### 4. Common law qualified immunity.

In the Officer's Reply to Parish's Opposition to their Motion for Summary Judgment, Officers Lansdale and Kush argue that under recent case law, Parish's state law claims are barred by qualified immunity. In *Spooner v. City of Phoenix,* 435 P.3d 462 (Ariz. Ct. App. 2018), the court recognized that "[c]ommon law qualified immunity generally provides public officials, including police officers, limited protection from liability when performing an act that inherently requires judgment or discretion." *Id.* at 466 (internal quotation marks and citation omitted). "If qualified immunity applies, a public official performing a discretionary act within the scope of her public duties may be liable only if []he knew or should have known that she was acting in violation of established law or acted in reckless disregard of whether h[is] activities would deprive another person of their rights." *Id.* at 467 (internal quotation marks and citation omitted).

Generally, courts will not consider new arguments raised in a reply brief. However, because the same rationale applies to the common law qualified immunity defense of state

1    claims that applied to the federal constitutional claims, the Court addresses, but denies

2    Defendants' request for summary judgment on the issue of common law qualified

3    immunity.

4    **VI.    Other Affirmative Defenses**

5         **A.    Statutory justification and necessity defenses.**

6         Parish seeks summary judgment precluding the Defendant Officers' reliance on

7    A.R.S §§ 13-402[25], 13-403(3)[26], 13-404[27], 13-406[28], 13-410[29], 13-411,[30] and 13-413[31], and

8    13-417.[32]   As with A.R.S. § 13-409, civil liability cannot be imposed on Defendants if they

9    engaged in conduct justified under the cited statutes, regardless of the theory of recovery.

10   *Ryan*, 425 P.3d at 239 (quoting A.R.S. § 13-413).   These defenses require that Defendants'

---

[25] In pertinent part, A.R.S. § 13-402 concerns justification in the use of physical force by "[a] reasonable person [who] believe[s] such conduct is required or authorized to assist a peace officer in the performance of such officer's duties notwithstanding that the officer exceeded the officer's legal authority."

[26] Under A.R.S. § 13-403(3), "[a] person responsible for the maintenance of order in a place where others are assembled . . . may use physical force if and to the extent that a reasonable person would believe it necessary to maintain order[.]"

[27] Under A.R.S. § 13-404(A), with certain exceptions, "a person is justified in threatening or using physical force against another when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force."   Additionally, "[t]he threat or use of physical force against another is not justified:   . . . To resist an arrest that the person knows or should know is being made by a peace officer or by a person acting in a peace officer's presence and at his direction, whether the arrest is lawful or unlawful, unless the physical force used by the peace officer exceeds that allowed by law[.]"  A.R.S. § 13-404(B)(2).

[28] A.R.S. § 13-406 permits use of force to defend a third person in certain situations.

[29] A.R.S. § 13-410 permits use of deadly physical force in certain situations.

[30] A.R.S. § 13-411 permits use of force necessary to prevent specified crimes.

[31] A.R.S. § 13-413 protects officers from civil liability for justified conduct under A.R.S. § 13-401 *et. seq.  See Ryan,* 245 Ariz. at 63, 425 P.3d at 239.

[32] Under A.R.S. § 13-417, "conduct that would otherwise constitute an offense is justified if a reasonable person was compelled to engage in the proscribed conduct and the person had no reasonable alternative to avoid imminent public or private injury greater than the injury that might reasonably result from the person's own conduct."   However, this defense is not available to a person who "intentionally, knowingly or recklessly placed himself in the situation in which it was probable that the person would have to engage in the proscribed conduct."  A.R.S. § 13-417(B).

actions must be reasonable in light of the circumstances. *See Gavigan v. Pima Cty.*, No. CV 02-212-TUC-RCC, 2007 WL 9724346, at \*3 (D. Ariz. Nov. 15, 2007).

In opposing Parish's motion, Defendants do not discuss A.R.S. §§ 13-406, 13-410 and 13-411. (*See* Doc. 51, pp. 10–11.) Thus, the Court will grant Parish's motion as to these statutes. As to the remaining Title 13 defenses, the Court will deny Parish's motion. As discussed in relation to the applicability of A.R.S. § 13-409, viewing the evidence in the light most favorable to Defendants, questions of material fact exist as to the applicability of these defenses.

**B. Defense of collateral estoppel/res judicata**.

Collateral estoppel binds a party to a decision issued in a previous law suit where: (1) the issue was actually litigated in the previous proceeding, (2) the parties had a full and fair opportunity and motive to litigate the issue, (3) a valid and final decision on the merits was reached, and (4) resolution of the issue was essential to the decision. *Kilian v. Equity Residential Trust,* No. 02–CV–1272–PHX–FJM, 2004 WL 3606893, \*1 (D. Ariz. May 27, 2004) (citation omitted).) Additionally, in some cases, there must be a common identity of the parties. *Id.* (mutuality not required with defensive use of collateral estoppel).

Parish argues that collateral estoppel is unavailable because Officers Lansdale and Kush "have never been parties in litigation against . . ." him. (Doc. 59, p. 10.) However, mutuality is not required here because the Officers are using collateral estoppel defensively. *See Kilian,* 2004 WL 3606893, at \*1. Thus, the Court will deny Parish's motion on this issue.

**C. Other defenses**

There are issues of fact as to the applicability of defenses under A.R.S. § 12-711 (intoxication) and failure to mitigate of damages. Moreover, these issues are not proper subjects of a motion for summary judgment. The Court will deny Parish's motion for summary judgment on these defenses.

**VII. Conclusion**

Based on the foregoing, the Court will grant in part and deny in part Plaintiff's Amended Motion for Summary Judgment (Doc. 63). The Court denies qualified immunity to Defendants Lansdale and Kush on Plaintiff's Fourth Amendment unlawful entry claims. The Court finds that issues of fact preclude resolution of qualified immunity as to Plaintiff's remaining constitutional claims. The Court denies Plaintiff's request for partial summary judgment on his state law claims and preclusion of certain defenses with the exception of A.R.S. §§ 13-406, 13-410, 13-411, and 12-712.

The Court will grant in part and deny in part Defendant Lansdale and Kush's motion for summary judgment. The Court denies Defendants qualified immunity on Plaintiff's Fourth Amendment unlawful entry claims. The Court denies Defendants qualified immunity as to the remaining constitutional claims based on the existence of material issues of fact. The Court denies Defendants' request for summary judgment on Plaintiff's state law claims, with the exception of Plaintiff's claims for negligence and punitive damages on state law causes of action, which will be dismissed.

The Court will grant in part and deny in part the motion for summary judgment of Defendants City of Tucson and Chief of Police. The Court will grant the motion to dismiss Defendant Chief of Police. The Court will grant the City's motion to enter judgment on Plaintiff's claim that the City covered up unconstitutional officer conduct, but deny the City's motion for judgment on Plaintiff's remaining *Monell* claim.

Accordingly,

IT IS ORDERED that

1.    Plaintiff's Amended Motion for Summary Judgment (Doc. 63) is GRANTED IN PART and DENIED IN PART.

2.    Defendants Troy Lansdale's and Bradley Kush's Motion for Summary Judgment (Doc. 64) is GRANTED IN PART and DENIED IN PART.

3.    Plaintiff's negligence claims and claim for punitive damages as to his state causes of action are dismissed.

4. Defendants City of Tucson and Chief of Police's Motion for Summary Judgment (Doc. 66) is GRANTED IN PART and DENIED IN PART. The TPD Police Chief is DISMISSED with prejudice.

5. The parties shall file the Joint Proposed Pretrial Order on or before **October 30, 2019**.

Dated this 30th day of September, 2019.

Honorable Jennifer G. Zipps
United States District Judge